## In re ROYCE DRY GOODS CO.

### (District Court, W. D. Missouri. November 7, 1904.)

1. **BANKRUPTCY—CONTESTED CLAIM—SUFFICIENCY OF OBJECTIONS FILED.**

    Objections to a claim filed against the estate of a bankrupt should be in writing, and sufficiently specific to indicate to the claimant the nature and character thereof, but no particular form is prescribed; and, where they have been treated on the hearing before the referee as sufficiently specific to raise certain defenses, on which evidence has been taken without objection, the court, on subsequent objection, may properly permit their amendment to conform to the evidence.

2. **SAME—REVIEW OF REFEREE'S DECISION—FINDINGS OF FACT.**

    The findings of a referee on questions of fact, made on conflicting evidence, will not be disturbed by the court on review where they are reasonably supported by competent evidence.

3. **SAME—CLAIM OF STOCKHOLDER AGAINST BANKRUPT CORPORATION—SET-OFF.**

    Under the established law of Missouri, which permits a subscriber to the stock of a corporation to pay his subscription in property other than money, provided it is of the reasonable value of the subscription, but makes him subject to strict inquiry as to such value, and liable for any unreasonable discrepancy, a trustee for a bankrupt corporation may interpose as a set-off to the claim of a stockholder a claim against him for the difference between the value of the property turned over by him in payment for his stock and the nominal value of the stock; and the court, in the interest of creditors, will scrutinize with care the integrity and fairness of the transaction.

4. **SAME—CLAIM BY PRESIDENT OF CORPORATION—PROPERTY UNACCOUNTED FOR.**

    The president and active manager of a mercantile corporation within a few months prior to its bankruptcy made a number of statements of its assets and liabilities to wholesale houses as a basis for credit, and on which he obtained goods for the corporation on credit, which were not paid for. There was a discrepancy between the invoice value of the goods on hand as represented in such statements and those on hand at the time of bankruptcy, and otherwise accounted for, of at least $25,000. Such president filed a claim against the estate for over $6,000. *Held* that, as against him, the representations made in his statements must be taken as true, and, the assets being in his control as managing officer, he was not entitled to share in the estate with other creditors until they were surrendered or satisfactorily accounted for.

In Bankruptcy. On review of decision of referee.

Karnes, New & Krauthoff, for trustee.
Wollman, Solomon & Cooper, for W. K. Royce.

¶ 2. Appeal and review in bankruptcy cases, see note to In re Eggert, 43 C. C. A. 9.

See Appeal and Error, vol. 3, Cent. Dig. § 4008.

PHILIPS, District Judge.   W. K. Royce, a stockholder in and president of the Royce Dry Goods Company, a corporation, presented to the referee in bankruptcy of said estate for allowance a claim for the sum of $6,480.74, alleged to be for moneys loaned, for rent of building used by the bankrupt, and for services rendered the bankrupt.   On objection made thereto by the trustee in bankruptcy, the referee disallowed this claim; and, on petition of the claimant, the questions involved have been certified to this court for review.

In the exceptions taken on the hearing before the court, counsel for the claimant made question of the sufficiency of the objections filed by the trustee to the allowance of this claim.   After notice to claimant's counsel, the court allowed these objections to be amended by amplifying the specifications.   The bankrupt act of July 1, 1898, c. 541, § 57f, 30 Stat. 560 [U. S. Comp. St. 1901, p. 3443], provides that "objections to claims shall be heard and determined as soon as the convenience of the court and the best interests of the estates and the claimants will permit."   There is nothing in the act or the rules in bankruptcy directing the form of such objections.   They should be in writing, and the specifications doubtless should be sufficiently explicit to indicate to the claimant the nature and character thereof. The written objections first interposed by the trustee to the claim in question are about as specific as the claim presented, which merely states that the aggregate sum, $6,480.74, is "for money loaned to the bankrupt, for rent for building used by the bankrupt, for services rendered to bankrupt."   The objections on which the hearing was had and the case turns were "that said bankrupt is not indebted to W. K. Royce in the amount named or in any other amount; that said W. K. Royce, as president of said bankrupt company, has failed to account for assets of said company."   Both the parties, in taking the testimony before the referee, seem to have proceeded upon the assumption that the objections were broad enough to go into the question of fact and law as to whether or not the claimant, as a stockholder in the bankrupt concern, had fully paid for the amount of his stock; and, second, as to whether or not at the time of the failure of the corporation the claimant, as president and active manager of the corporation, had failed to account for a large amount of the assets of the corporation, largely in excess of the amount of his claim.   Evidence was also introduced, in the form of depositions taken in St. Louis in behalf of the trustee in bankruptcy, tending to show that at various times during the year 1903, and up to within a short time prior to the suspension of business by the Royce Dry Goods Company on account of insolvency, the claimant, as president and active manager of the company, made statements to creditors of the concern as to the financial condition from time to time of the company, and the amount of assets on hand, and debts owing by it to various creditors; also tending to show that, on the faith of the truth of these representations and statements, some of the creditors who have proved up claims against the estate in bankruptcy extended to the company credit in the sale of additional goods to it.   There was no objection made on behalf of claimant on the hearing before the referee in respect of the evidence on the issue as to whether or not the claimant was indebted to the corporation on account of stock subscribed by

him to its capital, and as to the amount of property in his possession or control as president and active manager a short time before the failure. The amended specifications introduced no new matter into the controversy not inquired of before the referee, and the amended specifications are but conformable to the proofs before the referee, and which were fully discussed before and determined by him. It would be perfectly competent for this court to re-refer the matter back to the referee, with directions to require the objections to be made more specific, and to receive further evidence if justice demanded it. Section 2, subsec. 10, of the bankrupt act of July 1, 1898, c. 541, 30 Stat. 546 [U. S. Comp. St. 1901, p. 3421], authorizes the court to "consider and confirm, modify or overrule, or return with instructions for further proceedings, records and findings certified to them by referees." Section 954, Rev. St. U. S. [U. S. Comp. St. 1901, p. 696], declares that:

"No summons, writ, declaration," etc., "judgment, or other proceedings in civil causes, in any court of the United States, shall be abated, arrested, * * * or reversed for any defect or want of form; but the court * * * may at any time permit either of the parties to amend any defect in the process or pleadings, upon such conditions as it shall, in its discretion and by its rules, prescribe."

Conformably to the spirit of this statute, the courts have always been and should be liberal in the allowance of any form of pleading to meet the ends of justice and prevent mere technical objections, to defeat justice.

In view of the fact that claimant's counsel contended, in opposition to these amended specifications of objections, that he did not go fully into the question presented by the depositions of creditors tending to show that they had extended credit on the faith of representations and statements made by this claimant as to the financial condition of the concern, and the amount of assets on hand, as he did not deem such matter in issue under the objections, notwithstanding the fact it appears that the claimant was represented at the taking of said depositions by counsel and cross-examined the deponents, and notwithstanding the fact that on the hearing before the referee, which extended over a long period of time, this claimant was interrogated and testified in respect of some of these claims and representations made by him, the court, in a spirit of large liberality, accorded to the claimant the right to introduce further evidence touching the alleged representations made to said creditors, and whether or not any purchases of goods were subsequently made by him upon the faith of the truth of such representations, which additional testimony on behalf of the claimant has been introduced.

The referee has found that the sum claimed by W. K. Royce against the bankrupt estate is correct. The claim, therefore, should be allowed, unless the objections thereto are valid.

The first controversy is as to the contention of the trustee in bankruptcy that the claimant is indebted to the bankrupt corporation on account of stock subscribed by him to its capital. Section 68a of the bankrupt act of July 1, 1898, c. 541, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3450] provides that:

"In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

If, therefore, W. K. Royce, at the time he presented his claim for allowance, was indebted to the bankrupt corporation, that debt was an asset of the estate, and it was the duty of the trustee to interpose the same as a set-off or counterclaim.

The referee has found that the capital stock of this concern was $60,000, of which amount the claimant subscribed $32,000, which he had undertaken to pay by turning into the company different lots of goods and merchandise, which, in their reasonable value, fell short of the payment of this stock to the extent of $5,000. The conclusions reached by the referee on such questions of fact should not be disturbed by the court, on review, except for most cogent reasons, such as where there is no evidence to support the findings, or the findings are so contrary to the weight of evidence as to render them palpably unfair and unjust. Any other rule would plague the court with sitting as in a trial de novo in the vast multitude of claims passed on by the referee. The burden of this work of review in this district is becoming almost insupportable. It occupies much of the time of the court, with records of testimony running into hundreds of pages. It is so easy and inexpensive for defeated counsel to have the cases certified to the court for review that the per cent. of them is far in excess of the merits or importance of the questions involved. Where such questions involve the conclusions reached by the referee on matters of evidence, as in the case of a master, the court will abide by that conclusion, where it is reasonably supported by competent evidence, and the referee has drawn his conclusions from a conflict of evidence.

The evidence in this case shows that the entire capital stock of this corporation was attempted to be paid up by W. K. Royce and his two sons and Morton Wollman, as stockholders, by turning into the corporation stocks of goods representing the respective amounts of their shares. It is the established rule of law in this state that subscriptions to the capital stock of a business corporation of the state may be paid for by transferring to the corporation property other than money, of the reasonable value of the subscription. But the subscriber is held to strict inquiry as to any unreasonable disproportion between the valuation placed by him on the property conveyed and its actual value. Van Cleve et al. v. Berkey et al., 143 Mo. 109, 44 S. W. 743, 42 L. R. A. 593; Steam Stone Cutter Co. v. Scott et al., 157 Mo. 520, 57 S. W. 1076; McClure v. Paducah Iron Co., 90 Mo. App. 568, 578. As said by the Court of Appeals in National Tubeworks v. Gilfillan, 124 N. Y. 302, 26 N. E. 538:

"The fraud is consummated by the issue of its stock as full-paid stock which has not been fully paid, and it does not depend on any fraudulent intent, other than that which is evinced by the act of knowingly issuing stock for property in an amount in excess of its value."

This rule is stated in Thompson on Corporations, § 1621, approved in Boulton Carbon Co. v. Mills, 78 Iowa, 460, 43 N. W. 290, 5 L. R. A. 649, cited approvingly in McClure v. Paducah Iron Co., supra, as follows:

"If there is any meaning at all in the proposition that subscribers to the shares of a corporation must pay for them either in money or in money's worth, and if this principle has any substance at all when appealed to for

the protection of those who have given credit to the corporation, it must follow that where property is turned in to the corporation in payment of its shares, under whatever scheme, at an overvaluation, to the knowledge of the contracting parties, this will be evidence of fraud, such as will render the shareholders liable to make good to creditors of the corporation the difference between the par value of the shares and the real value at which the property was turned in."

In other words, as the declared policy of this state is to require absolute payment by stockholders, so that they shall represent to the creditors an actual asset, and the temptation is great among stockholders to put a fictitious or exaggerated value, like an old and abused stock of goods substituted for a money payment for stock by the incorporators, the courts will scrutinize with care the integrity and fairness of such payments, in favor of the creditors of the corporation.

There is in the record in this case evidence from which the referee was not unreasonably warranted in drawing the inference that W. K. Royce had placed an unreasonably exaggerated value on the stock of goods turned in to the corporation in payment of his subscription. The witness, Lee Dunlap, well known to the referee, came into this corporation as a stockholder after its organization. The corporation began business on the 19th day of May, 1902. In two weeks thereafter, about the 1st of June, when the intermediate purchases of goods probably exceeded the sales, an inventory of the goods was taken at cost price, which showed a shortage, according to the testimony of this witness, of $10,000. When regard is had to the fact that the goods contributed by the claimant came from stores which he had for many years been conducting, it may well be concluded that many of them were old and worn. So, if the inventory showed a shortage of $10,000 of the valuation placed on the entire stock transferred to the company, it discloses a discrepancy inconsistent with business integrity and fair dealing, not only as to the subsequent incoming stockholder, but as to the subsequent creditors. It is true, as contended by claimant's counsel, that Dunlap's testimony did not fix this loss, in the estimation, specifically upon the particular goods transferred to the company by the claimant, but upon the stock in mass. In the absence of any reliable proof on the part of the claimant that his proportion of the goods contributed were comparatively better than those of the other contributors, the inference was not unreasonably made by the referee that all were alike derelict. Moreover, the testimony of Dunlap is that the claimant recognized and acquiesced in the correctness of the inventory, by then and there agreeing to make good his proportion of the shortage, which he never did. The referee, who knew, saw, and heard the witnesses, credited Dunlap's statement, and I will not weigh the evidence. The relative apportionment of this shortage among the stockholders who put in goods allots to the share of the claimant $5,333.33. The referee fixed it in round numbers at $5,000. Treating this finding as a set-off, the referee should have allowed to the claimant the difference between $5,000 and the sum of $6,480.74 claimed by him. But the referee went further, and found that the claimant, who was president and active manager of the corporation, in charge of its affairs, during the year 1903, beginning in February, and on the 30th of November, 1903, within one month of the time the corporation ceased to be a going con-

cern and made an assignment, repeatedly made statements to the wholesale merchants from whom he was buying goods for the company as to the financial condition of the concern, and the amount of assets on hand at different periods, above the liabilities. These statements, beginning in the early part of 1903, and extending up to the 30th day of November, 1903, represented the amount of the assets on hand sometimes as high as $110,000. On the 30th of November, 1903, the amount represented to be on hand was $97,670; and, after allowing the debts of the estate owing by the concern, there should have been on hand at these different periods not less than $60,000 assets, above all liabilities. It is to be conceded that, in the case of some of these creditors who furnished goods to the concern in 1903, the statements were made after the goods were furnished, and therefore it cannot be said that they were furnished upon the faith of the truth of such statements. But this evidence was and is competent as statements made by the president and active manager of the company as to the amount of assets which should have been on hand at the time of the failure of the bankrupt concern. In the case of at least two, if not more, of these creditors, the evidence shows beyond question that the company obtained credit, and the goods were sold to it on credit, on the faith of the truth of such representations. In the case of the Ferguson-McKinney Dry Goods Company, one of the creditors, the evidence shows that on the 2d day of February, 1903, the claimant made a statement to the creditman of said house touching his financial condition, a memorandum of which was at the time taken, and is presented with the depositions, showing that on the 1st day of February, 1903, the Royce Dry Goods Company had assets on hand amounting to $127,000, with liabilities to the extent of $47,000, leaving a net worth of $80,000, and that their paid-up capital was $60,000. The following questions were asked the witness:

"Q. Why did you want the statement? A. He wanted to buy some goods. Q. Did you inform Mr. Royce at that time that you wanted the statement as a basis of credit? A. Yes, sir. Q. He gave it to you with that understanding—that it should be used as a basis of credit? A. Yes. Q. State whether or not your house sold the Royce Dry Goods Company any goods after this statement was made? A. Yes, sir."

And the evidence shows that at the time of the statement the Royce Dry Goods Company owed said house over $12,000. This witness also testified that he believed the statements made by W. K. Royce to be correct.

In the case of the La Prelle Shoe Company, a creditor, as late as September, 1903, the claimant, in a letter to this house, represented that the Royce Dry Goods Company had $3 assets to every dollar of liability; and as late as October 23, 1903, he represented to this house that he could pay two or three for every dollar he owed, and that there were assets at that time of $100,000; and after the letter of September 17, 1903, and as a result of the conversation with this claimant in October, 1903, credit was extended to him by this house for a bill of goods amounting to $200, and that this credit was extended upon the faith of the truth of his representations.

In the case of the Rice-Stix Dry Goods Company, the evidence shows that the goods were sold by it to this debtor in October, 1903, and that

thereupon W. K. Royce was asked for a statement respecting its condition, which was furnished, showing the cash value of the merchandise on hand when invoiced to be $97,670; value of real estate, $7,040; making in the aggregate the sum of $104,710, with liabilities at $33,739. After that time this house sold to the Royce Dry Goods Company about $490 worth of goods. It is true that, in transmitting this financial statement by Mr. Royce, he sent a letter in which he stated that he made the statement not to establish credit with the house, "as I have a well-established credit with other good houses that I have done business with for the last thirty years." As the statement he sent was on behalf of the Royce Dry Goods Company, it is questionable whether this letter did not have reference to his individual credit. But be this as it may, it was a statement made by him on the 30th of November, 1903, showing $104,710 worth of property of the concern, and liabilities to the extent of $33,739, leaving a balance of assets of $70,971. The goods invoiced in January following, after the failure of the concern, at $49,000, and the whole sum realized by the trustee in bankruptcy on the sale of all the assets was only $19,000. Making every reasonable allowance based on the evidence, there was at the time the company made its assignment, the 4th day of January, 1904, a discrepancy between the property W. K. Royce stated in writing to have been on hand November 30, 1903, of at least $25,000. What became of this difference? The presumption of law in such cases, in the absence of satisfactory explanation, is that the property traced to the hands of the bankrupt a short time prior to the suspension of business remains in his hands, and the bankrupt must answer therefor. In re Beuell, 100 Fed. 633; In re Greenberg (D. C.) 106 Fed. 496; In re McCormick (D. C.) 97 Fed. 566; In re Mayer (D. C.) 98 Fed. 839. Judge Sanborn, in Boyd v. Glucklich, 116 Fed. 142, 53 C. C. A. 462, expresses the rule thus:

"The property of the bankrupt estate traced to the recent possession or control of the bankrupt is presumed to remain there until he satisfactorily accounts to the court for its disposition or disappearance. He cannot escape an order for its surrender by simply adding perjury to fraudulent concealment or misappropriation. It is still the duty of the referee and of the court, notwithstanding his oath and his testimony, if satisfied beyond a reasonable doubt that he has property of the estate in his possession or under his control, to order him to surrender it to the trustee," etc.

The referee has found that W. K. Royce has failed to make a satisfactory explanation of the disposition of this undelivered asset, and I perceive no sufficient ground for holding that this conclusion is unsupported by the evidence. This fact conceded, will the law admit that the president and active manager of the derelict corporation, in actual control of its assets, may be allowed to prove up a claim against the estate of $6,480.74, where there has been traced to the hands of the management unaccounted for assets far in excess of his demand? Is it any answer in law to say that such assets is the obligation of the legal entity, the corporation, and not of the active, managing officer? The artificial being, the corporation, breathes, lives, and acts by and through its managing officers. It has no hands to hold and no pockets to conceal property. The actual custody and control of its assets are in and by its manager and director. As said in Re Alphin & Lake

Cotton Co. (D. C.) 131 Fed. 825–826: "For the purpose of informing the trustee or referee as to the assets of their bankrupt concern they [the officers] are the real parties." So it should follow that, for the assets intrusted to the hands of the managing officers of the bankrupt concern, they are jointly and severally liable. And it should logically and justly follow that when such derelict officer fails to account for and surrender property traced to his hands in excess of his demands against the bankrupt corporation, his claim should be rejected.

Without finding that the claimant obtained goods from the creditors of the corporation by fraudulent representations, or discussing what would be the legal effect of such fact upon the rights of the claimant to have his demand allowed, it is sufficient to say that when he comes to ask that he be permitted to participate in the dividends of the remaining assets of the insolvent estate pro rata with the creditors from whom he obtained the goods unpaid for, upon the faith of the truth of his statements as to the amount of the corporate assets, he should be held to the truth of those statements; the referee having found that at the time of the presentation of his claim for allowance there should have been, according to his written statement of November 30, 1903, one month anterior to his admitted insolvency, at least $25,000 of corporate assets controlled by him unaccounted for. In the marshaling of the assets of the bankrupt, the court, in the exercise of a jurisdiction equitable in its nature, should postpone the claim of such a wrongdoer, at least in favor of those creditors who parted with their property upon the faith of the truth of those representations. He cannot now change position as to the truth of his statements to the prejudice of the creditors who acted upon the faith thereof. When this claim was presented for allowance, the wronged creditors unquestionably had the right to object thereto on the ground that the claimant was estopped to deny the truth of his representations. If so, why may not the trustee for them? As said by Judge McCormick, speaking for the Court of Appeals of the Fifth Circuit, in Atkins v. Wilcox, 105 Fed. 597, 44 C. C. A. 628, 53 L. R. A. 118:

"By the express terms of the statute, the trustee is selected by the creditors. By the clearest implication, he represents all the creditors, and, as such representative, has an interest in the just administration of the estate which belongs to the creditors. Moreover, this right is expressly recognized in the sixth paragraph of general order in bankruptcy No. 21, which has itself the force of a statute, even if not clearly founded on the text of the statute, which we think it is. It appears to give the trustee precedence even of the creditors, for the language is that 'when the trustee or any creditor shall desire the re-examination of any claim filed against the bankrupt's estate, he may,'" etc.

It was therefore held that the trustee could resist a claim for a lien— as much so as any creditor.

There being no question of the insufficiency of the assets to pay the creditors of the estate, justice demands that this claimant shall not be permitted to establish his claim and participate equally with the creditors whom he has thus wronged, in the dividends, which at most will be very little.

In respect of the case of In re Park (D. C.) 102 Fed. 602, in which it was held that it is no defense to the failure of the trustee to set apart

the bankrupt's exemptions because the bankrupt has not accounted for all of his assets, and the like, it is sufficient to say that such exempt property does not pass to and vest in the trustee in bankruptcy under the bankrupt law. And the bankrupt court has no power to administer such property in any event. The only power vested in the bankrupt court is to set aside such exempt property, leaving the creditor claiming that such property is subject to his debt to pursue his remedy in the state court. Lockwood v. Exchange Bank, 190 U. S. 294, 23 Sup. Ct. 751, 47 L. Ed. 1061. Clearly enough, therefore, the trustee is in no position to claim that the bankrupt should not have the property set aside to him, on the ground that he had not accounted for the assets in his hands, as the bankrupt court itself was without jurisdiction to administer or control this exempt property. Whereas, in the case at bar, the claimant is asking to have allowed against the bankrupt estate a debt owing to him by the bankrupt, when he has withheld or concealed from the trustee in bankruptcy property which he had in his possession, or over which he had control, far in excess of the amount of his claim, and under a state of facts which should conclude him from denying the existence of such assets in his hands.

The exceptions to the referee's findings on the whole case are overruled.