Du Pont *et al. v.* Tilden *et al.*[1]

(*Circuit Court, N. D. Illinois.* March 7, 1890.)

CORPORATIONS—LIABILITY OF STOCKHOLDERS.

Where a corporation which is authorized by its charter to buy land, and pay for it in full-paid stock, issues such stock in payment for land to an amount greatly in excess of the value of the land, and the stock is sold to a purchaser for value, such purchaser is not liable to the creditors of the corporation on the ground that his stock is not fully paid for, where there was no fraud in the original transaction, and the corporation has taken no steps to rescind it.

In Equity.

*Mason Bros.*, for complainants.

*Judd, Ritchie & Esher*, for defendants.

BLODGETT, J. This is a bill brought by several judgment creditors of the Illinois Coal & Iron Company of La Salle, in this state, seeking to obtain a decree for the payment of their several judgments from certain of the stockholders of the company, on the ground that their stock has never been fully paid for. Originally there were quite a large number of stockholders made parties defendant, but the bill has been dismissed as to some by the complainants; others have been dropped out by the death of the defendants, and the bill was dismissed at the time of the final hearing, on pleadings and proofs as to four of the other defendants, on the ground that the proof did not show them to be stockholders, so that the case, as it now stands for final decree, only affects the estate of William B. Ogden, deceased, whose executors have appeared and answered, and James F. Joy. The ground on which complainants claim that the stock is not fully paid is that one E. D. Taylor, who was the president of the coal company, in the month of May, 1866, conveyed to the company, by deed, certain tracts of land in La Salle county, in this state, in payment for which there was issued to him 7,000 shares of the capital stock of the company, at $100 per share; that the deed of these lands from Taylor to the company only expressed a consideration of $150,000, and complainant has introduced parol proof tending to show that it was worth, in cash, even less than that sum at the time the conveyance was made, wherefore complainants contend that the stock so issued was only paid for to the extent of the value of the land so conveyed to the company.

The proof shows that the company was organized under a special charter granted by the legislature of Illinois on the 18th of February, 1857; that by its charter the capital of said company was fixed at $500,000, with power to increase it, but not to exceed $1,000,000, and that the company was, by its charter, authorized to purchase real estate, and pay for the same in stock; that stock certificates were to be issued to the stockholders on full payment for their stock; that the company organized under the said charter, and before the 18th of May, 1866, had issued

[1] Reported by Louis Boisot, Jr., of the Chicago bar.

stock to the amount of $300,000; that on the 18th day of May, 1866, at a meeting of the stockholders of the company, a resolution was adopted increasing the capital stock to the sum of $1,000,000, and provided that the $700,000 of increased stock should be issued to E. D. Taylor "for and in consideration of certain lands conveyed by him to said company by deed bearing date April 21, A. D. 1866." It also appears that Taylor did make a deed to the company, dated the 21st day of April, 1866, of certain lands in La Salle county, in which a consideration of $150,-000 is expressed. There is also in the record the oral testimony of two witnesses, claiming to have some recollection or information as to the value of the said lands in April, 1866, who testified, in substance, that said lands were not at that time worth to exceed the sum of $88,000. It also appears that 5,000 shares of these 7,000 shares of $100 each, which were to be issued for this land, were issued to Taylor, and that Taylor, within a few months thereafter, sold to William B. Ogden 1,363 of said shares, and that in 1874 he sold to the defendant James F. Joy 250 shares of stock, for which both Ogden and Joy, respectively, paid a full and valuable consideration,—probably more than the stock was worth at the time they received it, or ever has been since,—Taylor representing the stock to be full paid at the time of the purchase, and the said purchasers understanding and believing that it was fully paid. There is no proof showing the value of the stock of the company at the time this deed was made, and there is no proof of any bad faith or deception on the part of Taylor as to the value of the said land. Upon these facts, complainants claim that, even if the land conveyed by the deed of April 21, 1866, from Taylor to the company, was worth $150,000, the consideration recited in it, there was still left $550,000, which is about 78 per cent., unpaid on the par value of this stock, and that the defendants now before the court, as such stockholders, are liable to contribute this unpaid amount to the complainants as creditors of the company.

I think there can be no doubt from the proof in this case that the coal company agreed to give Taylor 7,000 shares of its stock for the land which he conveyed to it. The question, therefore, arises, does the fact that complainants' testimony shows, or tends to show, that this land was not worth in cash over $150,000 at the time it was conveyed to the coal company, establish any liability as against these stockholders? There being no proof in the record, aside from the resolution of the 18th of May, 1866, and the deed, of the negotiations and dealings between Taylor and the company, or of the circumstances surrounding the transaction and leading up to it, I shall assume it, as the only natural conclusion from the proof, that Taylor offered to sell these lands to the company for 7,000 shares of its stock, and the company accepted the proposition. Taylor made the deed of the land to the company, and the company issued to him the stock, or, at least, issued the shares now held by the defendants.

The question then arises, could the company have sued Taylor, and recovered the difference between the cash value of this land and the par value of its stock, without first rescinding this contract, even if the land

was not worth the par value of its stock? And this question, I think, must, upon reason and authority, be answered in the negative. See Cook, Stocks, § 47, where it is said:

"Many attempts have been made in cases where stock was issued for property taken at an overvaluation to hold the party receiving such stock liable for its full par value, less the actual value of the property received from him. These attempts have not been successful. As already seen, the transaction is upheld as legal and valid and binding on all parties, unless there is an overvaluation, and that overvaluation is shown to have been fraudulent. When this is proved, then, the contract is to be treated like other fraudulent contracts. It is to be adopted *in toto* or rescinded *in toto* and set aside. Both parties are to be restored as nearly as possible to their original positions. The property, or its value, is to be returned to the person receiving the stock, and he must return the stock or its real value."

See, also, *Coffin* v. *Ransdell*, 110 Ind. 417, 11 N. E. Rep. 20; *Scovill* v. *Thayer*, 105 U. S. 143; *Van Cott* v. *Van Brunt*, 82 N. Y. 535; and many other cases which might be cited to the same point.

It may, I think, be assumed as probable that the 7,000 shares of the stock of this coal company issued to Taylor were not worth, in cash, more than the land conveyed by Taylor to the company at the time this transaction took place. But the proof shows that, since these lands were so conveyed, the company has been engaged in mining coal from them, and hence it will be presumed that these lands were deemed valuable for the coal deposits supposed or known to be beneath them, and it is well known how prone men, and especially sanguine and hopeful men, are to overvalue mining and coal lands, what high estimates they place upon their future possibilities of value and development; and the fair inference from the testimony in this case is that this coal company, with its favorable charter, was satisfied to accept these lands, and did so accept them, in full payment for this stock, in the expectation and belief that the full value of the stock was represented by these lands. And the fact that this expectation may have proved fallacious, although there is no proof to that effect in the record, furnishes no ground for the present claim of complainants. They certainly have no higher equity than the company would have had as against Taylor, and the company would have had no such equity, except for a fraudulent overvaluation, and that only by a rescission of the contract by a prompt reconveyance of the land, so as to place Taylor in as good a position as he was when the transaction began.

The charter of the company allowed it to take real estate for stock, and hence, necessarily, left the value of such real estate to be agreed upon between the person from whom it acquired the real estate and the company; and also provided that stock certificates should only be issued on full payment. It therefore seems to me palpable that, even if a purchaser of its stock was bound to inquire whether the stock had been fully paid for or not,—a proposition which I do not think supported by authority,—such inquiry, at most, would, if made, only have disclosed the fact that the stock had been paid for in lands, and that perhaps some persons did not consider them worth as much as the stock at par,

but that would not prove that the company had not accepted them in full payment, as the resolution of the stockholders' meeting shows it did, nor that the stock so issued was not full paid. Nor would such facts have suggested that if he purchased the stock he would become liable to contribute to the difference between the value of the land and the par value of the stock. The stock had already been paid for once, and, in view of the situation of the parties to the contract, that payment was sufficient to protect the purchaser of the stock for value against the company or its creditors. It may be said that, on the ground of gross overvaluation alone, the company might, if it had acted in apt time, have had this transaction set aside, and the stock surrendered and canceled on a reconveyance of the land for the stock while it still remained in the hands of Taylor, but it is now impossible to restore the parties to their original condition. The stock, at least a part of it, has gone into the hands of *bona fide* purchasers for value, and the coal, as the proof shows, has been largely mined out of the land. The cases of *Bridge Co.* v. *McCluney,* 8 Mo. App. 500, and *Brant* v. *Ehlen,* 59 Md. 1, seem to me to be instructive upon the points raised, and conclusive against complainants' right to recover. The bill is dismissed for want of equity.